IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

TYREICE D. HAGGINS,

Plaintiff,

vs.                                      Case No. 10-2524-JTM

GARY LIBERTI, LARRY BALDWIN, HADLEY
BRADBURY, AND UNITED PARCEL SERVICE,

Defendants.

MEMORANDUM AND ORDER

Plaintiff Tyreice Haggins brought the present defamation against his former employer, United

Parcel Service, and three UPS supervisors, after he was terminated for falsifying his time records.

The evidence, however, fails to support a claim of defamation under Kansas law. Moreover, Kansas

law accords a qualified privilege to employers who make limited publication of defamatory material,

even if the information is inaccurate, for good faith business purposes. The evidence supports

application of the defense in the present action. The court therefore grants the defendants' Motion

for Summary Judgment.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories,

and admissions on file, together with affidavits, if any, show there is no genuine issue as to any

material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P.

56(c). In considering a motion for summary judgment, the court must examine all evidence in a light

most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.

1988). The party moving for summary judgment must demonstrate its entitlement to summary

judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.

1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual

allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

UPS, a package delivery company, has a policy prohibiting dishonesty by employees. The policy provides:

> We all expect our people to be honest in their assessment of themselves, such as time and commitment they give to their job, performance, the fairness they seek in their dealings with others.... DISHONESTY WILL result in immediate dismissal and possible criminal prosecution.

UPS hired Haggins as an unloader in March, 1998. Haggins reviewed UPS's honesty policy and signed a form titled "Honesty in Employment."

In February 2002, Mr. Haggins was promoted to safety specialist. Safety specialist duties include conducting audits, training responders (employees who respond to damaged hazardous material packages), and ensuring that damaged/leaking packages are disposed of safely.

During his employment at UPS, Haggins was assigned to its Lenexa Hub facilities located in Lenexa, Kansas, and its James Street facility in Kansas City, Kansas.

2

As a safety specialist at James Street, Haggins's regularly scheduled work hours were from 3:00 p.m. to 11:00 p.m. According to the company's Personal Time Recording System (PTRS) manual, "Report to Work" means "Time actually began working," and "Finish Work" means "the time the employee's work day ends."

In his response, Haggins contends that his "estimated arrival time for work [wa]s about 3:00 p.m.," and that he had "basically on-call status" and that he had been told that he had flexible hours, citing unauthenticated UPS PTRS records. The records themselves, however, confirm that Haggins was regularly scheduled to work from 3:00 to 11:00. More importantly, regardless of whether Haggins actually had a flexible schedule (UPS strongly contends that he did not), it is uncontroverted that Haggins — who was trained in PTRS and entered his own work time in the system — was expected to enter his actual arrival time on company records. He was not free to enter an arrival time which was materially incorrect.

Haggins was a full-time salaried employee who was eligible for overtime pay. Haggins admits that as a safety specialist, he received overtime compensation "a few times."

Part of Haggins' responsibilities in the Lenexa Hub was ensuring that certain equipment worked properly. In May 2008, UPS suspended Haggins for falsifying a hazardous material document. Haggins denies the falsification in his Response, but admits he was "sent home" for the incident. Asked in his deposition why he was sent home, Haggins responded by stating he could not remember the incident:

> I don't remember it vividly, but I know it had something to do with a smoke test . . . I don't recall the exact reasoning for it . . . it had something to do with the smoke test, but I don't – I don't recall vividly how it went down, what actually happened."

As part of Haggins' duties, he was responsible for ensuring that certain equipment, including oxygen masks, worked properly. To ensure that the masks worked properly, Haggins was required to conduct a "smoke test." Asked in his deposition "did you document that a smoke test had been conducted," Haggins responded: "Yeah. Any smoke tests that I conduct are documented."

3

After documenting he conducted the smoke test, UPS discovered that no smoke was available for testing on the date Haggins indicated the smoke test occurred. Haggins admitted in his deposition that the two glasses of smoke he purportedly used to conduct the smoke test were "broken," and "had already been used."

After Haggins came back from his suspension, he was counseled by Gary Liberti (then human resources manager) about maintaining the integrity of the equipment testing process.

In April 2009, Haggins was transferred from the Lenexa Hub to the James Street facility. He continued working as a full-time safety specialist, and he was also responsible for conducting audits and fixing "exceptions" (safety problems or discrepancies, such as leaking packages not being disposed of) as part of the internal auditing process in a timely manner. Haggins understood that UPS could be fined or face criminal sanctions if exceptions were found during audits and inspections by federal agencies.

Asked to whom he reported, Haggins responded: "Larry Baldwin was the person that I answered to." Janet Ballor (safety supervisor) and Hadley Bradbury (twilight sort manager) also had supervisory authority over Haggins.

On or about June 23, 2009, UPS's Comprehensive Health and Safety Program (CHSP) team, which included Ballor, conducted an internal audit of exceptions at the James Street facility. Ballor reviewed these and other exceptions with Haggins on July 7, 2009. To assist Haggins with the performance of his job, Ballor and Baldwin developed a Safety Responsibility task list identifying his daily, weekly, and monthly responsibilities.

Haggins' responsibilities included conducting daily damaged material program (DMP) audits, which are done with a checklist. The purpose of conducting a daily DMP audit is to ensure that damaged and leaking packages are processed and disposed in a timely manner. Failure to process and dispose of hazardous damaged packages could jeopardize the safety of employees and subject UPS to fines or criminal sanctions.

When a package is damaged, a responder (a person trained to handle damaged packages) enters the package information into a computer program, which generates a damaged material notification (DMN) and a temporary identification is assigned to the damaged package. The DMN is sent to a disposal company notifying it that a package was damaged.

The DMN Temporary ID assigned to the package is a number that indicates (1) the date the damaged package was generated, (2) the number of the spill, and (3) where the spill occurred. For example, a temporary ID number "0622200902P" indicates that the damaged package or spill was generated on June 22, 2009. The last two numbers, "02", indicate that the package was the second damaged package generated that day. And the last character "P" indicates "pre-load," where the package or spill was generated.

The responder is also supposed to obtain and submit a material safety data sheet (MSDS) to the disposal company. The MSDS informs the disposal company about the content of the package, including whether it is flammable or hazardous. The disposal company then informs the responder where to dispose of the damaged package, such as throwing it in the trash, or placing it in a a drum for later removal by the disposal company.

Haggins was responsible for reviewing the DMP to ensure that damaged packages were properly disposed and processed by the responders.

On or about July 10, 2009, Ballor went to the James Street facility to see whether Haggins resolved exceptions previously identified in the DMP by the CHSP team. She found that multiple audit reports signed by Haggins contained false information.

On July 2, 2009, Haggins had signed a DMP daily inspection form, checking all the "OK" boxes on the DMP daily inspection form, indicating that no exceptions existed. Haggins admits that by signing the DMP daily inspection form, he represented that he conducted the audit. Haggins also admits that if he checked the "OK" box on the inspection form, he represented that no exception existed for that box.

5

Specifically, Haggins represented in his July 2, 2009 audit that: (1) there were no temporary IDs older than two business days under box A.1.a of the form; (2) there were no temporary IDs that required a MSDS under box A.1.c; (3) all container information faxes were processed under box B.2, and (4) full drum (container) confirmation faxes were processed under box B.3. However, Ballor later discovered that at the time of the audit (1) there were temporary IDs older than two business days, (2) there were temporary IDs that required a MSDS, and (3) the "OK" box checked under box B.2 was incorrect because Ballor herself processed that item after July 2, and (4) the "OK" box checked under box B.3 was incorrect because Ballor herself processed that item after July 2, 2009.

Additionally, contrary to Haggins' audit report, Ballor found that several other documents confirmed that multiple temporary IDs were older than two business days (that is, older than June 30, 2009) and required a MSDS. Ballor further found that a July 3, 2009 audit performed and signed by Haggins contained identical misrepresentations that were in the July 2 audit. Ballor reviewed with Haggins the misrepresentations she found in his audit reports.

In his Response, Haggins attempts to controvert the existence of any errors in his DMP audits by citing a portion of his deposition where he offered the conclusion that, "[i]f plaintiff check things are okay, they are okay the day of the inspection." (Dkt. 51, at 12). But Haggins did not dispute in his deposition any of the specific discrepancies cited by Ballor in her investigation.

Further, Haggins cannot dispute the specifics of Ballor's investigation for the simple reason that he no longer has any idea what the specifics of the audits mean. Asked in his deposition about the audit discrepancies, Haggins again responded by stating that he could not remember the details:

> I put UPS, you know, that actual job, behind me, and I just – I'm not – I don't necessarily remember all the process. So for me – I don't want to sit here and answer questions that I can't recollect all the way.

Asked specifically about the information in the July 2 audit form, Haggins responded:

> You're asking me what it means as if I'm trained, and I have been doing it every day or whatever, and I haven't been. And so, therefore, I mean – you know, I can't answer questions to something that I haven't been doing in almost two years ... the answers [sic] that you're asking me, I'm – I'm not complaint to answer those. I don't have any interpretation about it. I mean, I – I don't work there anymore, and I'm just not."

Asked about the content in the July 3 audit form he signed, Haggins responded:

> When I was terminated, that's when my understanding and recollection of anything
> of UPS was over. I mean, I – I do not remember the process, nor have I been trained
> to know it since August 12th of 2009.

He simply does not remember what the audit forms represented:

> Q.  And as you sit here today, just as in the prior forms, you don't recall what these
> particular details mean such as no temporary ID's older than two business days
> old and no temp ID's require MSDS; you don't recall what those particular
> sentences mean?
>
> A.  No.
>
> Q.  No, you don't recall?
>
> A.  No. I – no, I do not understand what they mean.

(Haggins dep. at 112).

On July 7, 2009, Haggins signed a DMP daily inspection form, checking all the "OK" boxes on the DMP daily inspection form, indicating no exceptions existed. Haggins admits that by signing the DMP daily inspection form, he represented that he conducted the inspection, and that, if he checked the "OK" box on the inspection form, he represented that no exception existed for that box. Specifically, Haggins represented in his July 7, 2009 audit that: (1) there were no temporary IDs older than two business days under box A.1.a of the form; (2) there were no temporary IDs that required a MSDS under box A.1.c; (3) all container information faxes were processed under box B.2, and (4) full drum (container) confirmation faxes were processed under box B.3.

Ballor discovered, however, that as of July 7, 2009, that (1) there were temporary IDs older than two business days, (2) there were temporary IDs that required a MSDS, and (3) the "OK" box checked under box B.2 was incorrect because Ms. Ballor herself processed that item after July 7, and (4) the "OK" box checked under box B.3 was incorrect because Ballor herself processed that item after July 7, 2009. Several documents also indicate that multiple temporary IDs were older than two business days and required a MSDS.

Ballor further found that the July 8 and 9 audits performed and signed by Haggins contained identical misrepresentations as in the July 2, 3, and 7 audits. She reviewed with Haggins the

7

misrepresentations she found in his audit reports, and asked him whether his audit forms were accurate based on the exceptions she reviewed with him, and Haggins responded, "No." Ballor wrote a memorandum around that time detailing her discussion with Haggins.

Haggins admits that Larry Baldwin had talks with him "about different things that they may have felt was inaccurate," and that they told him they thought his audit forms contained "questionable information." Asked whether he recalled disagreeing with Ballor and Baldwin that his audits contained questionable information, Haggins responded, "I don't recall specific."

On Monday, July 27, 2009, Baldwin, Ballor, Bradbury met with Haggins to discuss his task list and audit reports. Haggins represented at the meeting that he performed daily DMP audits on July 17 and July 23, 2009. However, there were no July 17 and 23 audit forms to confirm the audits were conducted. In his Response, Haggins speculates that "Janet Ballor may have removed, concealed , or lost the audit reports in issue," (Dkt. 51, at 14) but offers no evidence in support of this claim.

With no documents to confirm that these audits were conducted, Ballor concluded Haggins did not conduct the audits. She prepared a memorandum on July 28, 2009, detailing the discussion regarding the missing audit reports, writing, "Tyreice stated that he did the audit but didn't write it down on the form. To Larry and I that meant the audit wasn't done."

At Haggins' deposition, however, he testified that he had written the audits down, and that he kept those reports in "my own notebook, and I kept it locked up" but which was subsequently lost.

It is uncontroverted that Haggins never told Baldwin or Ballor that he kept the July 17 and 23 audit forms in his own personal notebook. Haggins admits that he never showed Baldwin or Ballor any documents showing he conducted the July 17 and 23 audits.

On Tuesday, July 28, 2009, Baldwin and Ballor met with Human Resources Manager Gary Liberti to discuss Haggins' job performance and his misrepresentations. They decided that Ballor would perform an OJS (on-job supervision) on Haggins. During an OJS, a supervisor is with an employee throughout the employee's entire shift and records each and everything the employee does during the shift.

On July 30, 2009, Ms. Ballor performed a "punch-to-punch" OJS on Haggins. Haggins' shift was scheduled to begin at 3:00 p.m. However, Haggins did not arrive to work until almost 3:30 p.m. After the conclusion of Haggins' shift, it was determined that Haggins recorded in the PTRS system that he began working at 3:15 p.m.

On August 4, 2009, Baldwin asked Joe Oberle, UPS security supervisor, to review the video tape at the guard shack (entry and exit to UPS building) to confirm what time Haggins actually arrived to work on July 30th. Oberle reviewed the video tape, and advised Mr. Baldwin that Haggins walked through the guard shack at approximately 3:28 p.m.

Baldwin then asked Oberle to review the guard shack video tape for the week of July 20 and the week of July 27 and compare the times Haggins arrived with the actual start time Haggins recorded for each day of the week in the PTRS system.

Oberle compared the times Haggins arrived to work with the actual start times Haggins recorded in the PTRS system. Although Haggins' assigned shift was scheduled to begin at 3:00 p.m. each day and end at 11:00 p.m. each day, Haggins consistently arrived to work late or left early on each day.

The following table reflects the times when Haggins claimed he arrived and departed from UPS, in comparison to his actual arrivals and departures as shown in security camera footage.

| Date | Arrival | | Departure | |
|------|---------|---|-----------|---|
|  | Haggins | Security Camera | Haggins | Security Camera |
| July 20 | 3:00 | 3:12 | 10:45 | 10:41 |
| July 21 | 3:00 | 3:10 | 11:30 | 10:48 |
| July 22 | 3:00 | 3:14 | 10:45 | 10:59 |
| July 23 | 3:00 | 3:16 | 10:30 | 10:28 |
| July 27 | 3:00 | 3:11 | 11:30 | 11:05 |
| July 28 | 3:00 | 3:50 | 11:00 | 10:51 |
| July 29 | 3:00 | 3:35 | 11:20 | 10:49 |

On or about August 10, 2009, Baldwin, Liberti, Steve Kenneke (Division Manager), Bradbury, and Oberle met with Haggins to discuss the audit and timecard misrepresentations. Oberle presented documents at the meeting to Haggins showing his timecard discrepancies.

Haggins was asked in his deposition, "did Joe Oberle tell you that he actually observed you coming into work from July 20th through July 27th at different times from that which you put on your time card?" Haggins responded, "Yeah." He did not disagree at the meeting that his time cards were inaccurate.

Baldwin asked Haggins, "Tyreice what does this look like from our perspective?" Haggins responded, "an integrity issue."

Oberle prepared an investigation report on or about August 10, 2009, summarizing part of the meeting. The report stated in part:

> Security was requested to audit PTRS. Tyreice [Haggins] admitted that he had been falsifying his time card in PTRS. Security did a two week check and on every day he was late to work and early to leave. He also was asked what this time card issue means to UPS and why he was being asked about this. His response was "I understand that it was an integrity issue" .... On one occasion he was asked why he put he was 15 minutes late [on July 30] and the reason was he said he saw Janet Ballor doing an OJS on him.

Haggins was sent home after the meeting and was asked to return the following day.

Haggins was asked in his deposition, "Did Hadley Bradbury ever state in any meeting that you were a part of that you falsified your time cards?" Haggins responded: "Not once did that – do I ever remember him saying that, not even once... Hadley did not mention anything about falsifying time cards."

Haggins was then asked, "Do you know whether or not Hadley Bradbury ever told anybody that you falsified your time cards?" Haggins responded: "Not to my knowledge."

Asked whether Larry Baldwin accused him of falsifying his time cards, Haggins responded: "Well, all I can remember is that he reviewed the report that was given to him I guess by Joe [Oberle], and you know, he went over them and said it seems like to me that you're falsifying your

time." Haggins admits that Mr. Baldwin's alleged statement was based on Joe Oberle's report. Haggins admits that any statements made by Gary Liberti regarding the falsification of his time cards were based on information provided by Larry Baldwin.

Haggins had a chance to make statements at the meeting and an opportunity to ask questions. He did not ask any questions. Following this meeting, Baldwin consulted with Liberti, and the decision was made to take Haggins out of service. Haggins testified that "I don't know" whether Gary Liberti or Larry Baldwin communicated that he falsified his time cards to anybody outside the August 10 meeting.

On or about August 11, 2009, Baldwin and Liberti met with Haggins and he was terminated.

Larry Baldwin, Gary Liberti, and Hadley Bradbury have never made any statements to non-management employees regarding Haggins' timecard discrepancies.

Asked in his deposition to identify all persons who thought less of him because of any statements made by Gary Liberti or Larry Baldwin concerning his timecard discrepancie, Haggins testified that Thomas McCrary (a former coworker) called him and said "now you're in the unemployment line, and if I see you on the street I'll – I'll whip your ass." McCrary, however, only left a voicemail and did not mention that he heard any statements by Larry Baldwin or Gary Liberti concerning Haggins' time cards.

Haggins testified that after he was terminated, Jason Moore (a former coworker) called him and said, "that's kind of messed up. Well, I'll – I'll holler at you." According to Haggins, "that was pretty much how the conversation went... I didn't go into detail with him about what they alleged."

Haggins testified that Rodney Fritz (a former co-worker) told him: "I heard you got fired for stealing time," and "word gets around."

Haggins was asked in his deposition: "So Jason Moore and Rodney Fritz didn't indicate to you that they heard Larry Baldwin or Gary Liberti say that you falsified your time cards?" Haggins responded: "No. But, again... there were only five people in that room.... I can't know who started to spread the fact that I had been terminated.... They could have heard it from anyone in that room."

11

Although Haggins initially said that Gayle Ferguson (Human Resources Manager) thought less of him, he later testified he did not know whether she thought less of him. He also testified that a receptionist, whose name he could not remember, cancelled him deejaying at her sister's wedding, but she never indicated why she cancelled.

Haggins is currently employed by "The Whole Person" as a payroll specialist.

***Defamation***

In the Pretrial Order, Haggins alleges that he was defamed when the defendants published information that he had falsified time records.[1] Defamation under Kansas law has three elements: (1) the communication or publication (2) of false and defamatory words (3) which damage the reputation of the plaintiff. *See McCauley v. Raytheon Travel Air.*, 152 F. Supp. 2d 1267, 1276 (D. Kan. 2001). Haggins' claim of defamation fails because the evidence fails to support any of the three essential elements.

Asked if defendant Hadley Bradbury had communicated information about the false time card to any third parties, Haggins testified "Not to my knowledge." When he was asked the same question

---

[1] Following the defendant's summary judgment motion, Haggins asserted, for the first time in this litigation, the claim that the defendants also told third persons that he "stole time and money from UPS." The court will not allow this eleventh-hour attempt to attribute to the defendants a novel (and far more dramatic) alleged defamatory statement.

The Pretrial Order (Dkt. 28) contains no suggestion of such a statement, but is restricted to the claim that defendants told other persons that he had "falsified his pay record." The court utilizes Pretrial Orders, which are entered after careful deliberation and frequently with considerable effort by counsel and the court, for the purpose of narrowing the outstanding issues and allegations. They control the subsequent scope of the litigation, and may not be disregard at whim. *See Hullman v. Bd. of Trustees*, 950 F.2d 665, 668 (10th Cir. 1991) (internal quotation omitted) ("the pretrial order measures the dimensions of the lawsuit, both in the trial court and on appeal").

This rule and result is particularly necessary and appropriate here, in light of the heightened pleading requirement attached to defamation claims. *Marten v. Yellow Freight Sys.*, 993 F.Supp. 822, 829 (D. Kan. 1998). Kansas law requires that plaintiffs claiming defamation give specific pleading notice as to the nature of the defamatory words allegedly used by the defendant, and, as a result, courts will not consider alleged defamation claims not mentioned in the Pretrial Order. *McCauley*, 152 F.Supp.2d at 1277 n.7 (D. Kan. 2001) (refusing to address allegation, not made in the pretrial order, that circumstances required self-republication of defamatory statements ).

as to Gary Liberti or Larry Baldwin, Haggins responded, "No, I don't know." Haggins affirmatively testified that "I can't know who started to spread the fact that I had been terminated." Without evidence as to their source, mere workplace rumors are insufficient to supply the publication element of defamation under Kansas law. *See McCauley*, 152 F. Supp. 2d at 1276.

Nor has Haggins shown that the information allegedly published by the defendants was materially false. The evidence shows that Haggins consistently entered false arrival and departure times in the company's computer system. While a few of the errors were within a few minutes of the actual time recorded on company security cameras, most were substantial, extending from a quarter of an hour to nearly an hour. And, with a single exception, all of the errors served to exaggerate the time which Haggins appeared to be working.

Haggins argues that the time cards were irrelevant, because he had an employment contract to be paid a set amount, and thus his salary was not dependent on his time records. He also argues that he had been told that his arrival time was flexible, and that he could estimate his time on the time records.

Even if Haggins was permitted a flexible schedule, which UPS denies, this would not authorize the entry of false information in the company's records. Haggins supplies no evidence supporting his claim of an employment contract such as he describes. Further, while Haggins was a salaried employee, the uncontroverted evidence shows that Haggins was eligible for, and did occasionally, receive overtime pay, which was dependent on the PTRS system. Further, Haggins had been trained in the PTRS system, and that system called for the entry of actual arrival and departure times.

The evidence does not support Haggins' contention that he was permitted to estimate his time. Haggins was asked specifically about this claim in his deposition, and whether, in telling him about the job, Hadley Bradley had used the word "estimation." Haggins responded simply that he was told to come in "around, you know, 3:00," that "when the work is done, then you leave," and when he left "I had to, you know, give them a roundabout time as to when I would leave."

13

Whether or not Haggins was indeed allowed to "estimate" his time is irrelevant, as the evidence shows that Haggins time entries were materially and consistently inaccurate. Within the few workdays reviewed by UPS supervisors, Haggins had claimed an additional two and a half hours of work time by listing arrival times which were earlier than his real arrival time. During the same period, his inaccurate departure entries served to reflect that he had worked an additional hour and a half longer than he had actually done. These are not minor inconsistencies, but errors of sufficient magnitude that a reasonable employer could conclude that the plaintiff had not complied with its policies. Because the defendants' conclusions as to Haggins' inaccurate time records were true or substantially true, summary judgment is proper as to the claim of defamation. *See Bundren v. Parriott*, No. 05-1040-JTM, 2006 WL 1805867 (D. Kan. June 29, 2006) ("[t]ruth and substantial truth are a complete defense to a claim of defamation").

Finally, Haggins has failed to show any damage to his reputation. In an action for defamation, "[t]he plaintiff must show how his or her true reputation in the community of his or her residence has been affected." *Lindemuth v. Goodyear Tire and Rubber*, 19 Kan.App.2d 95, 864 P.2d 744, 751 (1993). As noted earlier, in his deposition Haggins was unable to identify any person who thought less of him because of the conclusion by UPS that he had falsified his time records.

In his Response to the summary judgment motion, however, Haggins has now supplied the affidavits from two co-workers about their reaction to the termination. Both Jason Moore and Rodney Fritz aver:

> My reaction and feeling ... was that Tyreice Haggins is not a trustworthy person, and as far as I am concerned Mr. Haggins' reputation was damaged in my eyes because of the accusation.

The language is identical in both affidavits.

The court finds that the proffered affidavits fail to support a finding of damaged reputation. First, they reflect only the affiant's individual reaction to the allegations. Neither affiant provides any indication that they are familiar with Haggins' general reputation in the community, or that it has caused him some other, specific and identifiable damage. Second, in both cases, the affiant renders

14

his "reaction and feeling" based upon the purported statement that Haggins "stole time and money from UPS," which was not a part of the allegations advanced by Haggins in the Pretrial Order. Accordingly, summary judgment is appropriate in light of the failure of the plaintiff to supply any evidence that the termination for falsifying pay records has worked any injury to Haggins' reputation.

Moreover, the defendants are entitled to the protection of the qualified immunity which exists under Kansas law for good faith communications involving employee history. That defense exists when (1) the communication is a business or employment communication, (2) the defendant acted in good faith, and (3) made the statement to others with a corresponding interest or duty. *Turner v. Halliburton Co.*, 722 P.2d 1106, 1112-13 (Kan. 1986). *See also Luttrell v. United Telephone Sys.*, 9 Kan.App.2d 620, 620-21, 683 P.2d 1292 (1984), *aff'd*, 236 Kan. 710, 695 P.2d 1279 (1985). To recover, the plaintiff must demonstrate "'not only that the statements were false, but also that the statements were made with actual malice with actual evil-mindedness or specific intent to injure.'" *Turner*, 240 Kan. at 8, 722 P.2d 1106 *(quoting Munsell v. Ideal Food Stores*, 208 Kan. 909, 920-21, 494 P.2d 1063 (1972)).

In *Turner*, the court applied the defense in the case of an alleged employee theft, finding that "[e]mployee conduct, particularly involving theft, is a matter within the bounds of the qualified privilege pertaining to communications within the company." *Id*. at 1114. The defense applies even if the accusation against the employee turns out to be untrue, so long as it was not advanced maliciously. *Id*. There is no evidence that any of the defendants communicated to other persons the allegation that Haggins had falsified time records. Haggins has supplied absolutely no evidence to support a finding that the defense is inapplicable, other than a theory, ungrounded in any admissible evidence, that the defendants conspired against him as a means to "make a move" on him.

The court notes that Haggins, during the course of his Response, also requests that the court grant summary judgment in his favor. Such a result is of course precluded by the court's findings in the present opinion. However, such a motion would in any event be denied in light of its timing (a full two months after the dispositive motion deadline, and submitted without any request to be

15

relieved of that deadline), and its content, with plaintiff making no attempt to comply with the court's rules governing the content of such motion. See D.Kan.Rule 56.1.

IT IS ACCORDINGLY ORDERED this 21st  day of December, 2011, that the defendants' Motion for Summary Judgment (Dkt. 46) is hereby granted.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE